# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| TRAXCELL TECHNOLOGIES, LLC,<br><br>     Plaintiff,<br><br>   v.<br><br>HUAWEI TECHNOLOGIES USA, INC.,<br><br>     Defendant. | Civil Action No.: 2:17-cv-00042-RWS-RSP<br><br>(Consolidated Lead Case)<br><br>**JURY TRIAL DEMANDED** |
| TRAXCELL TECHNOLOGIES, LLC,<br><br>     Plaintiff,<br><br>   v.<br><br>NOKIA SOLUTIONS AND NETWORKS OY and NOKIA SOLUTIONS AND NETWORKS US LLC,<br><br>     Defendants. | Civil Action No.: 2:17-cv-00044-RWS-RSP<br><br>**JURY TRIAL DEMANDED** |

# DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................... 1

II.     LEGAL STANDARD ............................................................................................... 1

III.    ARGUMENT ............................................................................................................ 2

        1.      "means for receiving said performance data . . ." limitations ............................ 2

        2.      "first computer"/"computer" ............................................................................. 8

        3.      "performance data" ........................................................................................... 11

        4.      "location" ........................................................................................................... 13

        5.      "one of the radio-frequency transceivers" ........................................................ 16

        6.      "referencing performance" ............................................................................... 18

        7.      "in order to restrict processing of radio frequency signals from at least one of said at least two wireless devices . . . in order to improve communication with at least one said wireless device" ..................................... 19

        8.      Claim 12 of the '284 Patent ............................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## Cases

*American Piledriving Equipment, Inc. v. Geoquip, Inc.*,
   2011 WL 1045360, 637 F.3d 1324 (Fed. Cir. 2011)................................................................2

*Amhil Enterprises Ltd. v. Wawa, Inc.*,
   81 F.3d 1554 (Fed. Cir. 1996) ...........................................................................................1, 9

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997) ...............................................................................................4

*Cinel v. Connick*,
   15 F.3d 1338 (5th Cir. 1994)..........................................................................17, 18, 19, 20

*DeMarini Sports, Inc. v. Worth, Inc.*,
   239 F.3d 1314 (Fed. Cir. 2001) ...............................................................................................1

*Elekta Instrument S.A. v. O.U.R. Sci. Int'l*,
   214 F.3d 1302 (Fed. Cir. 2000) ...............................................................................................2

*Eon Corp. IP Holdings LLC v. AT&T Mobility LLC*,
   785 F. 3d 616 (Fed. Cir. 2015) ................................................................................................7

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
   673 F.3d 1361 (Fed. Cir. 2012) ...............................................................................................7

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
   Case No. 2:15-cv-00011-RSP, 2017 WL 5137401 (E.D. Tex. Nov. 4, 2017) ...................17

*Gillespie v. Dywidag Systems Intern.*,
   501 F.3d 1285 (Fed. Cir. 2007) ...............................................................................................1

*Image Processing Technologies, LLC v. Samsung Electronics Co.*,
   Case No. 2:16-CV-505, 2017 WL 2672616 (E.D. Tex. 2017)............................................17

*In re Katz Interactive Call Processing Patent*,
   639 F. 3d 1303 (Fed. Cir. 2011) .......................................................................................7, 21

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005) .............................................................................................20

*MarcTec, LLC v. Johnson & Johnson*,
   2010 WL 3075289, 394 Fed. App'x 685 (Fed. Cir. 2010)......................................................2

*Medicines Company v. Mylan, Inc.*,
   853 F.3d 1296 (Fed. Cir. 2017) .......................................................................................15, 16

*Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*,
   248 F.3d 1303 (Fed. Cir. 2001) ...............................................................................................4

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
   415 F.3d 1335 (Fed. Cir. 2005) ...............................................................................................2

*Omega Engineering, Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003) ......................................................................................1

*Regents of the University of California v. Eli Lilly & Co*.,
   119 F.3d 1559, 43 U.S.P.Q.2d 1398 (Fed. Cir. 1997 ....................................................2

*Rembrandt Data Technologies, LP v. AOL, LLC*,
   98 U.S.P.Q.2d 1393 (Fed. Cir. 2011) ..........................................................................21

*Rheox, Inc. v. Entact, Inc*.,
   276 F.3d 1319 (Fed. Cir. 2002) ......................................................................................1

*Vivid Tech., Inc. v. Am. Science & Eng'g, Inc*.,
   200 F.3d 795 (Fed. Cir. 1999) ....................................................................................2, 3

*WMS Gaming, Inc. v. Int'l Game Tech.*,
   184 F. 3d 1339 (Fed. Cir. 1999) ....................................................................................6

## Statutes

35 U.S.C. § 112 ...........................................................................................................3, 19

## I.   INTRODUCTION

This brief addresses 8 disputed claim term groups from three related patents: U.S. Patent Nos. 9,510,320; 8,977,284; 9,642,024.  Traxcell seeks broad and unsupportable constructions for many of these claim terms, whereas Defendants' constructions capture the plain meaning of the terms in view of the intrinsic record.  Defendants' constructions also give due weight to the clear and repeated representations that Traxcell made during prosecution to secure issuance of these patents.

## II.   LEGAL STANDARD

This Court is very familiar with the principles of claim construction, and therefore Defendants provide only a brief recitation of the law related to prosecution history disclaimer, which supports many of Defendants' proposed constructions.  "The prosecution history is considered to determine whether or not there were any express representations made in obtaining the patent regarding the scope and meaning of the claims." *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1323 (Fed. Cir. 2001).  Courts "assess whether a patentee relinquished a particular claim construction based on the totality of the prosecution history, which includes amendments to claims and arguments made to overcome or distinguish references." *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326 (Fed. Cir. 2002).  "An examination of the prosecution history is particularly important where . . . the claimed invention is in a crowded art." *Amhil Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1560 (Fed. Cir. 1996) (prosecution history narrowed term "substantially vertical" to mean vertical and not sloped).

"Where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Engineering, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323–24 (Fed. Cir. 2003); *see Gillespie v. Dywidag Systems Intern.*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent.").  What matters for prosecution disclaimer is that the applicant disclaimed the subject matter, not whether the examiner

1

was correct in believing that the subject matter was disclosed by a prior art reference, or whether the examiner's rejection was proper. *See Regents of the University of California v. Eli Lilly & Co*., 119 F.3d 1559, 1572 n.6 (Fed. Cir. 1997) (arguing that the examiner's rejection was erroneous "misses the point of the analysis of prosecution history"). Similarly, prosecution history disclaimer applies even if the applicant disclaimed *more* than was required to traverse the examiner's rejection. *See MarcTec, LLC v. Johnson & Johnson,* 394 Fed. App'x 685, 687 (Fed. Cir. 2010) ("Limitations clearly adopted by the applicant during prosecution are not subject to negation during litigation, on the argument that the limitations were not really needed in order to overcome the reference."); *American Piledriving Equipment, Inc. v. Geoquip, Inc*., 637 F.3d 1324, 1336 (Fed. Cir. 2011) ("We have made clear . . . [that] an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well."). A prosecution disclaimer is dispositive, even if it results in reading-out preferred embodiments. *See, e.g.*, *N. Am. Container, Inc. v. Plastipak Packaging, Inc*., 415 F.3d 1335, 1345 – 46 (Fed. Cir. 2005) ("we have previously explained that limitations may be construed to exclude a preferred embodiment if the prosecution history compels such a result"); *Elekta Instrument S.A. v. O.U.R. Sci. Int'l*, 214 F.3d 1302, 1308 (Fed. Cir. 2000).

## III.    ARGUMENT[1]

### 1.    "means for receiving said performance data . . ." limitations

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|------|----------------------|-------------------|
| means for receiving said performance data and suggest | This is a 112, ¶ 6 claim element. | This is a §112, ¶6 term. |

---

[1]    Traxcell argues that Defendants must prove why the terms at issue are relevant to the parties' dispute. This appears to be based on a misreading of *Vivid Tech., Inc. v. Am. Science & Eng'g, Inc*., which does not impose any such requirement. 200 F.3d 795, 803 (Fed. Cir. 1999). Although *Vivid Tech* stated that, for case management, the district court *may* "require litigants to identify the aspects of their case that are material to the dispute," it did not hold that it is ***required***. In fact, *Vivid Tech* declined to issue broad requirements such as this to the district courts and rejected the

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|---|---|---|
| corrective actions obtained from a list of possible causes for said radio tower based upon the performance data and the corresponding location associated with said at least one wireless device<br><br>'284 Patent – claim 1<br><br>means for receiving said performance data and corresponding locations from said radio tower and correcting radio frequency signals of said radio tower in order to improve communication with said wireless devices<br><br>'284 Patent – claim 1 | Structure: The algorithm disclosed in Fig. 38-A <u>and Fig. 38-B</u> and described at col. 54, line 21 through col. 55, line 2<br><br>Function: "receiving said performance data and suggest corrective actions obtained from a list of possible causes for said radio tower based upon the performance data and the corresponding location associated with said at least one wireless device" (claim 1) / "receiving said performance data and corresponding locations from said radio tower and correcting radio frequency signals of said radio tower in order to improve communication with said wireless devices" (claim 12) | Structure, material or acts: "Primary Analytic Software operationally connected to Monitoring software and Fault Diagnosis/Correction Software" |

The parties agree that these claim terms are in means-plus-function form.  From there, the parties diverge.  Defendants' proposal comports with applicable claim construction principles, while Plaintiff's proposal fails to comply with Federal Circuit case law.  Pursuant to 35 U.S.C. § 112 ¶ 6, a means-plus-function claim "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  The parties disagree as to both the recited function and the corresponding structure.

---

plaintiff's request to adopt a uniform rule regarding when Markman hearings must be held.  *Id.*  This Court has no rule that the Defendants must specifically identify the relevance of the terms at issue, but Defendants have no problem doing so.  Each of the construed claim terms relates to Defendants' non-infringement of the patents-in-suit, except for the indefinite terms discussed below, which naturally relate to invalidity.

"The first step in construing such a limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Plaintiff does not propose any function, and provides no explanation for failing to do so. (Opening Br. at 3-4.) Defendants propose the plain language of the function recited in the claim limitations, i.e., the language following "means for" in those limitations, as set forth above. The Court should adopt Defendants' proposed construction because it is the plain language of the claims and is unrebutted.

The parties further disagree as to the structure corresponding to the recited function. Notably, the recited "function" is, in fact, two sub-functions. The first sub-function is "receiving said performance data [and corresponding locations from said radio tower]." The second sub-function is "suggest[ing] corrective actions obtained from a list of possible causes for said radio tower based upon the performance data and the corresponding location associated with said at least one wireless device" in the case of claim 1, and "correcting radio frequency signals of said radio tower in order to improve communication with said wireless devices" in the case of claim 12. This brief will generally focus on the claim 1 variant, but the arguments herein are applicable to claim 12 for the same reasons.

Structure disclosed in the specification is corresponding structure "if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). The '284 Patent only discloses one component that both receives performance data and suggests corrective actions as required by the two sub-functions of this limitation, and that is "Fault Diagnosis/Correction Software 2806." For instance, the '284 Patent discloses that "[o]nce a number of possible causes for the fault have been isolated, the fault diagnosis and correction software 2806 can then perform diagnostic testing within the wireless network 100 to eliminate false positives, and provide a list of possible

4

causes and corrective actions which may by preformed [*sic*] by the wireless network engineers." (Ex.1, '284 Patent at 39:40-45).  The Fault Diagnosis/Correction Software 2806 "receives" the "performance data" in the form of a "case file."  *Id*. at 39:36-40.  Figure 38-A "is a description of the fault diagnosis/correction software 2806" and describes the algorithm for its operation.  Step 3834 of Fig. 38-A continues execution in Fig. 38-B.[2]



(Ex. 1, '284 Patent at Fig. 38-A, box 3834 (highlighting added)).  This algorithm shows receipt of a "case file" (box 3806 in Fig. 38-A), with the algorithm continuing through Figs. 38-A and 38-B to

---

    [2]  Although Defendants identified Figure 38-A as the corresponding algorithm in the Joint Claim Construction Statement, this algorithm expressly continues in Fig. 38-B, and therefore Defendants further identify Fig. 38-B now to avoid any ambiguity regarding the relevant structure.

identify "CORRECTION[s]" (boxes 3860-3868 in Fig. 38-B), which may be sent to "primary analytic software." *Id.* at Fig. 38-B, box 3870.

That is not, however, the end of the inquiry. "In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F. 3d 1339, 1349 (Fed. Cir. 1999). Fault Diagnosis/Correction Software is software executing on a general purpose computer. Fig. 28 of the '284 Patent shows that Fault Diagnosis/Correction Software 2806 is part of a system labeled numeral "2800" (described elsewhere in the patent as the "current invention"), which includes "internal CPU and computer 2816." (Ex. 1, '284 Patent at Fig. 28). The "internal CPU and computer 2816" are described generically as hardware that "can power and run the current invention's 2800 software." In other words, the '284 Patent clearly describes this as a general purpose computer. Plaintiff does not appear to dispute that the corresponding software in the '284 Patent executes on a general purpose computer.

Pursuant to *WMS Gaming*, the corresponding structure is not then "Fault Diagnosis/Correction Software," but rather a computer programmed to perform the algorithm of the Fault Diagnosis/Correction Software. That algorithm is described in a conventional flow chart format as is commonly used to describe a software algorithm in Fig. 38-A, which continues through Fig. 38-B, as identified in Defendants' corresponding structure.

Plaintiff identifies "Primary Analytic Software operationally connected to Monitoring software and Fault Diagnosis/Correction Software" as its proposed corresponding structure. In one sense, namely its reference to Fault Diagnosis/Correction Software, Defendants have some limited agreement with a portion of Plaintiff's proposal. However, Plaintiff's proposal suffers from one fatal flaw—it

does not incorporate the related algorithm as required by *WMS Gaming*.  Plaintiff appears to rely on the limited exception to *WMS Gaming* recited in *In re Katz Interactive Call Processing Patent*, 639 F. 3d 1303 (Fed. Cir. 2011).  In *Katz*, the Federal Circuit held that "[a]bsent a possible narrower construction of the terms 'processing,' 'receiving,' and 'storing,' . . . those functions can be achieved by any general purpose computer without special programming."  *Id*. at 1316; *see Eon Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F. 3d 616, 621 (Fed. Cir. 2015) (discussing the "*Katz* Exception").  This exception to the general rules applies only in "rare circumstances."  *Eon*, 785 F. 3d at 621 (quoting *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012)).  Those rare circumstances do not exist here because, as the Federal Circuit explained, functions that require "special programming" do require an algorithm.  *Id*.

Plaintiff cannot plausibly argue that the complex function here falls within the *Katz* exception.  Although one "sub-function" does recite receiving certain data, the function also requires "suggest[ing] corrective actions obtained from a list of possible causes for said radio tower based upon the performance data and the corresponding location associated with said at least one wireless device" (claim 1) or "correcting radio frequency signals of said radio tower in order to improve communication with said wireless devices" (claim 12).  That is not a simple function like "processing," "receiving," and "storing" that can be performed by any general purpose processor, but rather is the heart of the '284 Patent's purported invention.  This function is more similar to the functions identified by Plaintiff as "[e]xamples of non-general, special purpose" functions.  (Op. Br. at 4.)  The "rare" *Katz* exception does not apply here, and the corresponding structure should include the algorithm performed by the Fault Diagnosis/Correction Software as set forth in Figures 38-A and 38-B.

### 2. "first computer"/"computer"

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|------|----------------------|-------------------|
| "first computer" / "computer"<br><br>'284 Patent – claims 1 and 12 (first computer)<br>'320 Patent – claims 1 and 4 (first computer)<br>'024 Patent – claims 1, 11, and 17 (computer) | "same first computer" / "same computer" | "system comprising memory, hardware, and software" |

The claims of the asserted patent, at a high level, generally a recite a computer that is programmed to take certain actions. For instance, claim 1 of the '284 patent recites "a first computer programmed to perform the steps of: 1) locating . . . and 2) routinely storing . . . ," and further recites that *said* first computer is "further programmed to, 1) receive said error code. . . and, 2) selectively suggest a corrective action."[3] As another example, claim 1 of the '024 patent recites "a computer . . . programmed to locate . . . and generate . . . , wherein the computer further receives and stores . . . , wherein the computer references . . . , wherein the computer determines . . . , wherein the computer further receives . . . , determines . . . , and wherein the computer determines . . . ." The claims therefore unambiguously require that the ***same computer*** is programmed to perform all these steps. This is the construction Defendants propose. Defendants submit that this meaning is unambiguous from the plain and ordinary meaning of the claim language. If there were any ambiguity in the plain and ordinary meaning, the Applicant resolved that ambiguity during prosecution, arguing that using two or more computers does not satisfy the satisfy the "first computer" and "computer" claim terms. Specifically, to overcome obviousness and anticipation rejections, the Applicant distinguished prior art systems that used multiple computers as far less advanced and usable than the invention. Traxcell

---

[3] ***Emphasis*** and annotations in figures in this brief are added unless otherwise noted that they exist in the original.

cannot ignore these arguments and now accuse multi-computer systems of infringement.  Traxcell's disclaimer applies with additional force here because "[a]n examination of the prosecution history is particularly important where . . . the claimed invention is in a crowded art," *Amhil Enterprises*, 81 F.3d at 1560, and the Applicant explicitly admitted that his invention exists in a crowded art.  (Ex. 2, 2012-09-28 Office Action Resp. at 66 ("The invention is classified in a crowded art, therefore, a small step forward should be regarded as significant.").)

To overcome a rejection over U.S. Patent No. 6,334,047 to Andersson, the Applicant wrote an entire section of his office action response entitled "Single computer needed in Reed *et al* v. additional software needed in Andersson *et al.*"

> **II.M.   Single computer needed in Reed *et al.* v. additional software needed in Andersson *et al.***
>
> Unlike Reed, Anderson's mobile station needs to be outfitted with a very complex series of extra hardware and software and antenna equipment contained within

(Ex. 2, 2012-09-28 Office Action Resp. at 36.)  In this section, the Applicant explained that "Reed teaches a first computer that will improve communication with *Andersson's* mobile stations, ***without the requirement of all of Andersson's extra equipment*.  Reed's invention for it [*sic*] functionality *requires only 'a first computer'*.**" (*Id.*)  Later, the Applicant clarified that "***Reed offers a single computer*** . . . ***without the need for*** special hardware in the phone, ***second computers***, or a two way tuning communication with the wireless device." (*Id.* at 37.)  To overcome obviousness rejections over a combination of U.S. Patent No. 6,845,246 to Steer and U.S. Patent No. 6,334,047 to Andersson, the Applicant further argued that "[w]hile Andersson requires . . . ***a second computer requiring additional hardware and software***[] in order to improve communication, ***Reed requires only a first computer*** to reference the location and performance data for the wireless device . . . .  This is not taught by combining *Andersson* with *Steer*." (*Id.* at 17.)  Defendants' construction effectuates the plain meaning of Traxcell's claims.  A claim that recites a computer programmed to perform steps A

and B, wherein the computer is further programmed to perform steps C and D, is not met by a system that use one computer to perform steps A and B and a separate computer to perform steps C and D. The claimed "first computer" and "computer" cannot be multiple separate computers, which was taught in the prior art and distinguished from the invention; all claimed references to a "[first] computer" must be to the ***same*** computer.

Traxcell provides a single sentence supporting its construction of computer as "system comprising memory, hardware, and software." (Op. Br. at 5.)  Traxcell's proposed construction fails for the same reasons discussed above, namely that a "system" including hardware and software is far broader than a "computer" because it could include an entire network of computers instead of the same or single computer described during the prosecution history.  Traxcell's proposal is also contrary to the patent specification, which makes clear that when the patent refers to a "computer" it refers to a single traditional computer, not an ambiguous "system."  (Ex. 1, '284 Patent, Fig. 29 at block 2910.)



In fact, Traxcell's proposed construction almost exactly mirrors Traxcell's characterization of the Andersson prior art reference Traxcell ***distinguished*** during prosecution based on the "computer" term.  That is, Traxcell characterized the prior art reference as needing to be "outfitted with a very complex series of ***extra hardware and software and antenna equipment***," whereas in contrast "Reed teaches a first computer that will improve communication with *Andersson's* mobile stations, ***without***

*the requirement of all of Andersson's extra equipment*.  Reed's invention for it [*sic*] functionality *requires only 'a first computer'*."  (Ex. 2, 2012-09-28 Office Action Resp. at 36.)  That is, Traxcell was distinguishing the prior art, which required "extra hardware and software," with the claimed "first computer."  In view of this distinction, Traxcell's proposal, "system comprising memory, hardware, and software," inappropriately seeks to capture exactly the prior art distinguished in prosecution.

### 3. "performance data"

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|------|----------------------|-------------------|
| "performance data"<br><br>'284 Patent – claims 1 and 12<br>'320 Patent – claims 1 and 4<br>'024 Patent – claims 1, 6, 11, and 17 | "metric regarding performance not generated by the wireless communications device" | No construction necessary |

During prosecution, the Applicant was forced to overcome a number of prior art references that taught receiving "performance data" from a mobile device and using that performance data to make the cellular system more efficient.  To avoid those prior art references, the Applicant clearly and unambiguously disclaimed using performance data that was generated by the wireless communications device and sent to the first computer or base station.  Instead, the alleged invention must generate the performance data at the base station.  Traxcell may not now reclaim this subject matter after being forced to relinquish it during prosecution.

The Applicant could not have made this distinction more clear during prosecution.  In response to a rejection over the *Andersson* prior art reference, the Applicant created a chart showing the differences between the claimed system and the prior art *Andersson* system.  The Applicant argued that the invention "references performance of a wireless device *without receiving the actual performance data from the wireless device itself*."  (Ex. 2, 2012-09-28 Office Action Resp. at 22.)  In contrast, the prior art Andersson system allegedly has a "Mobile Station MS1 which . . . transfers this

data to the Base Station BSA or BSB for comparison." (*Id.*) The Applicant further distinguished *Andersson* by noting that *Andersson's* performance data, the carrier to interference ratio, "is detected by *Andersson*'s Mobile Station (***NOT AT THE BASE STATION***)." (*Id.* (all caps in original).)

| <u>Reed et al.  Application No.: 11/505,578</u> | <u>Andersson</u> *et al.* (U.S. Pat. # 6,334,047) |
|---|---|
| [0614] The present invention then can allow a detailed display of the wireless network's problems, and correct the network's problems with a fault diagnosis and correction system. | *"An objective if the invention is to control the transmit power of a radio transceiver."* [Andersson, col. 5, lines 42-45]. |
| Reed teaches a first computer that references performance of a wireless device without receiving the actual performance data from the wireless device itself.  Reed's first computer is able to reference this performance data by monitoring the radio tower. | *"The value of a signal parameter detected from a received signal is compared to a desired signal parameter value and a difference is determined."* [Andersson, col. 5, lines 45-48]. Andersson teaches a Mobile Station MS1, which detects signal parameters, and then transfers this data to the Base Station BSA or BSB for comparison. |

(*Id.* (highlighting added).)

| | |
|---|---|
| Reed shows in figure 36, a first computer with monitoring Software that monitors the base station for messages.  If message contains "flagged criteria", then the Flagged criteria is extracted from the message, and decoded into a case file format.  The case file is formatted for specified type of "flagged criteria".  Reed shown in figure 37, the type of performance data that may be included with the case file; including, case file number (3722), location of wireless device (3700), error code (3720), wireless device ID (3724), radio tower location (2824), fault diagnosis/correction (2806), and other user factors (3726). | *Anderson* shows a method where the *"carrier-to-inference ratio" (CIR) is detected by Andersson's Mobile Station (Fig. #3, #100).* (NOT AT THE BASE STATION) The CIR is determined by Andersson's mobile station, and the CIR data is then transmitted via a special "power control message on a *dedicated physical control* channel". Andersson does not consider monitoring the base station for *"carrier-to-inference ratio" (CIR),* or any other type of performance data related to his mobile station.  In Andersson's world, the CIR must be determined by his mobile station. |

(*Id.* (highlighting added).) The Applicant made similar and equally clear statements in other portions of his office action responses, representing that "Reed ***does not require the CIR*** [carrier to interference ratio] ***from the wireless device***, or an operative connection with the mobile station in order to improve communication." (*Id.*; *see also id.* at 23 ("Reed's first computer can improve the radio frequency communication ***without*** adjusting the power of the wireless device, or ***receiving the CIR from the wireless device by any means***."); *Id.* at 27 ("*Andersson* does not consider monitoring the

base station for the 'carrier-to-interference ratio'. . . In *Andersson's* world, the CIR must be determined by his mobile station and then transmitted to the base station.  *Andersson's* first computer cannot reference the performance data of a wireless device, without receiving said performance data from his mobile station MS1.  Reed does not require the extra steps or equipment required by *Andersson*, to send and receive performance data between the base station and the wireless device.").) The Applicant thus clearly and unambiguously distinguished the claimed invention, which uses performance data generated at the base station, from the prior art references, which used performance data generated at the mobile stations.  Traxcell cannot recapture this disclaimed subject matter.

### 4.   "location"[4]

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|---|---|---|
| "location"<br><br>'284 Patent – claims 1 and 12<br>'320 Patent – claims 1 and 4<br>'024 Patent – claims 1, 6, 11, and 17 | "location, excluding grid positioning," | "geographical data"<br><br>or<br><br>plain and ordinary meaning |

The parties agree that "location" is a readily understandable term.  (Op. Br. at 7.)  Nothing in the patent specification alters the term's readily understood meaning or requires a new construction. During prosecution, however, the Applicant clearly and unmistakably carved grid positioning out of the plain meaning of the term "location."  Plaintiff should not be able to now renege on this promise and accuse Defendants' products as infringing through the use of grid positioning systems.

During prosecution, the Applicant was faced with a rejection over U.S. Patent No. 6,845,246 to Steer, entitled "Location based power control for mobile communications systems."  Steer disclosed taking measurements at different locations in a "grid."  Steer disclosed that rather than providing a

---

[4]   Defendants are dropping their proposed construction for "corrective action" and assent to Traxcell's proposed construction of plain and ordinary meaning.

specific latitude and longitude location for a measurement, "a grid of survey locations may be used to cover the area.  For typical suburban area, a spacing of about 100 meters between grid lines may be used.  For rural cells, a spacing of 500 meters would be appropriate."  (Ex. 3, Steer at 11:7-12.) Although a measurement could be traced to a particular "box" in the grid, measurements were not associated with an actual latitude and longitude location.  The Examiner cited Steer as an obviousness reference, stating that although one reference fails "to disclose . . . locating at least one wireless device on the wireless network," the Steer reference "discloses a method and apparatus for facilitating power control within mobile radio system [which] comprises the step of locating at least one wireless device on the wireless network and storing a corresponding location."  (Ex. 4, 12/12/2012 Office Action at 3.)

In response, the Applicant argued that the "grid pattern" of Steer does not satisfy the claims of the '284 Patent.  Specifically, the Applicant included a section titled "Grid pattern not required in Reed *et al.* v. grid pattern required in Steer *et al.*"  (Ex. 2, 9/28/2012 Amendment at 50.)  In that section, the Applicant criticized the "grid approach" for not offering the level of precision offered by the Applicant's invention.  The Applicant argued that "[t]his 'grid pattern' does not allow for fine tuning within the 'grid pattern' in real time" and "all wireless devices within the same grid pattern receive the same tuning."  (*Id*.)  The Applicant argued that the claimed invention did not include "the limitation of a 'grid pattern' and offers a more adaptable system which can react to changes in network load, climate changes, [and] new buildings in a more refined means."  (*Id*.)  The Applicant concluded that "Reed teaches in Claim 1, a first computer that can 'suggest corrective action for said radio tower' without the limitation of a 'grid pattern' and offers a more adaptable system which can react to changes in network load, climate changes, new buildings in a more refined means."  (*Id*. at 50-51.)  In other words, Applicant repeatedly contrasted the approach of claim 1 with the "grid pattern" of the Steer prior art reference and emphasized the inability to provide fine tuning within the grid pattern as

14

compared to the "more refined" location-based approach of the alleged invention to secure issuance of his patent.  These repeated and unambiguous representations to the Examiner disclaimed the use of "grid patterns" to determine handset location in the invention.

In contrast to the plain meaning of "location" and the clear disclaimer in the file history, Traxcell's entire affirmative position consists of a statement that "[a] construction of 'geographical data' is supported by the '284 patent," followed by bare citations to the specification of the '284 Patent.  (Op. Br. at 7.)  But no disclosure from the specification redefines location to mean "geographical data" and none of Traxcell's citations to the patents supports its overly broad construction.  *See Medicines Company v. Mylan, Inc.*, 853 F.3d 1296, 1306 (Fed. Cir. 2017) (rejecting construction where the intrinsic evidence "lack[ed] the clear expression of intent necessary for a patentee to act as its own lexicographer").  In fact, the specification makes clear that the terms "location" and "geographical data" are used differently in the patents.  (*See, e.g.*, '284 Patent at 5:5-6:4 (explaining how a "location" is determined), 6:22-29 (contrasting "geographic data" with a location), 6:30-34, 7:46-8:8, 29:33-34.)

Traxcell's construction would also be inconsistent with and far broader than the patentee's description of location as used in ***the invention***, which refers instead to location according to its ordinary meaning, *e.g.* "latitude and longitude."[5]  (Ex. 1, '284 Patent at 16:28-31 ("***this invention*** of both a machine and process focuses directly on the ability to use dynamic location based information of a plurality of wireless devices [] ***in the form of latitude and longitude***").)[6]  The patentee chose to

---

[5]   Other descriptions of location in the specification, which Traxcell cites without argument, are equally at odds with Traxcell's overly broad proposal and show no intention to redefine the term "location."  *See, e.g.*, '284 Patent at 6:22-29, 7:46-61, 7:62-8:8, 6:15-21.

[6] Traxcell cites and relies upon this portion of the specification (Op. Br. at 7 n.27), but it—like the other portions of the specification cited in Traxcell's brief—offers no support for Traxcell's attempt to redefine "location."

use the term "location" in the claims *rather than* the term "geographical data" and should not be permitted to rewrite its claims during this litigation.  *See Medicines Company*, 853 F.3d at 1306 (rejecting attempt to construe claim term without a showing of lexicographic intent).

Further, construing location broadly as "geographical data" would lead to absurd results and be inconsistent with the plain meaning of the term.  "Geographical data" means any data about geography, and geography is the study of the physical features of the earth and its atmosphere.[7] Geographical data, therefore, includes the height of the Rocky Mountains, the width of the Rio Grande, and the time the sun sets in Tokyo, none of which of course have anything to do with Traxcell's patents.

Traxcell hedges and argues in the alternative that "'location' is an easily understandable term" and that "any construction . . . would only confuse rather than clarify the term's meaning."  (Op. Br. at 7.)  On this point, the parties agree.  As a general matter, "location" is easily understood and does not require construction, with the exception that the jury would not understand that the Applicant disclaimed a particular and narrow embodiment related to location—grid positioning—without a clarifying construction.  If the Court does not agree that Traxcell disclaimed this narrow embodiment during prosecution, Defendants urge the Court give the term "location" its plain and ordinary meaning.

### 5.   "one of the radio-frequency transceivers"

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|------|----------------------|-------------------|
| one of the radio-frequency transceivers<br><br>'024 Patent – claims 11, 17 | Indefinite | Whether claim is indefinite is not properly part of Markman proceeding. |

---

[7]  Ex. 5, https://www.dictionary.com/browse/geography ("the science dealing with the areal differentiation of the earth's surface, as shown in the character, arrangement, and interrelations over the world of such elements as climate, elevation, soil, vegetation, population, land use, industries, or states, and of the unit areas formed by the complex of these individual elements.").

Traxcell provides no substantive arguments regarding indefiniteness, for this term or any of the following terms.  By choosing not to argue these issues in its opening brief, Traxcell has waived those arguments.  *Cinel v. Connick,* 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim."); *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, Case No. 2:15-cv-00011-RSP, 2017 WL 5137401, at *15 (E.D. Tex. Nov. 4, 2017) ("TCL's failure to timely raise these claim construction arguments should ordinarily result in waiver of the arguments.") (Payne, M.J.).  Traxcell instead makes a procedural argument that raising indefiniteness at the claim construction stage is improper.  This argument has no merit because the Court's orders explicitly required the parties to raise and argue indefiniteness during claim construction.  The Court's docket control order states that "[i]n lieu of early motions for summary judgment, the parties are directed to include any arguments related to the issue of indefiniteness in their Markman briefing, subject to the local rules' normal page limits."  Dkt. 183 at 5.  There was no excuse or justification for Traxcell choosing not to brief the indefiniteness issues.

Setting aside Traxcell's waiver, this claim term is indefinite for lack of adequate antecedent basis.  Although not all failures to provide antecedent basis will trigger indefiniteness, where the lack of antecedent basis removes reasonable certainty about the meaning of the claim, a Court must find that the claim is indefinite.  *Image Processing Technologies, LLC v. Samsung Electronics Co*., Case No. 2:16-CV-505, 2017 WL 2672616, *31-*33 (E.D. Tex. 2017) (finding indefinite the claim term "the boundary" where the claim depended from another claim reciting four boundaries).

Both claims 11 and 17 of the '024 Patent claim "multiple radio-frequency transceivers" and later refer to "one of the radio-frequency transceivers."  As in *Image Processing Tech.*, it is ambiguous *which* "one of the multiple radio-frequency transceivers" is being referenced.  Had the claim been written to say "***the*** one of the multiple radio-frequency transceivers," it would have been clear which

radio frequency transceiver is performing the function—the same one.  Or if the claim had been written to say "*a second* one of the multiple radio-frequency transceivers," it would have been clear that two different radio-frequency transceivers perform the functions.

Both claims 11 and 17 refer first to "multiple radio frequency transceivers" and then also refer to "one of the radio-frequency transceivers."   Claim 11, however, also refers to "a particular one of the radio-frequency transceivers," and claim 17 also refers to "the particular radio-frequency transceiver" (a term for which there is no antecedent basis).  In both claims 11 and 17, it is unclear if the "one of the radio-frequency transceivers" is supposed to be the same as the "particular" radio-frequency transceiver also mentioned in the claim.

Without any antecedent basis or other explanation for these ambiguities, it is impossible to resolve the scope of the claims, and therefore they must be indefinite.

### 6.      "referencing performance"

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|------|----------------------|-------------------|
| Referencing performance<br><br>'284 Patent – claim 1 | Indefinite | Whether claim is indefinite is not properly part of Markman proceeding. |

Traxcell again chose not to brief indefiniteness for this term and has therefore waived its arguments.  *Cinel*, 15 F.3d at 1345; Dkt. 183 at 5.  The phrase "referencing performance" appears in a limitation that reads "a first computer programmed to perform the steps of . . . locating at least one said wireless device on said wireless network and referencing performance of said at least one wireless device with wireless network known parameters."  Claim 1 requires a first computer programmed to perform the step of "referencing performance of said at least one wireless device with wireless network known parameters."  This phrase is indefinite because the term "referencing performance" in claim 1 is hopelessly ambiguous.  "Referencing" is not a term that is understood in the art to have a particular meaning, and the specification provides no insight into its usage.  The claim separately

18

describes the actions of "storing" and "receiving" performance information, indicating that "referencing" does not mean either.  Because the claim term does not have any understood meaning, and Traxcell has proposed none, the Court should find that it is indefinite.

Further, it is not clear whether "referencing performance" as it is used in claim 1 requires the *location* of "at least one said wireless device on said wireless network" to be referenced with the corresponding performance of the "at least one said wireless device on said wireless network."  To the extent that Plaintiff argues that "referencing performance" does not require the *location* of "at least one said wireless device on said wireless network" to be referenced with the corresponding performance of the "at least one said wireless device on said wireless network," then this claim element is not adequately supported by the written description and is not commensurate in scope with the enabling disclosure, and is indefinite under pre-AIA 35 U.S.C. 112, ¶ 1.

7.   **"in order to restrict processing of radio frequency signals from at least one of said at least two wireless devices . . . in order to improve communication with at least one said wireless device"**

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|---|---|---|
| in order to restrict processing of radio frequency signals from at least one of said at least two wireless devices . . . in order to improve communication with at least one said wireless device <br><br> '284 Patent – claim 1 | Indefinite | Whether claim is indefinite is not properly part of Markman proceeding. |

As with the other indefinite terms, Traxcell chose not to provide affirmative arguments and has therefore waived them.  *Cinel*, 15 F.3d at 1345; Dkt. 183 at 5.  Claim 1 of the '284 Patent claims "at least two wireless devices" and later claims (in the phrase at issue) that processing of radio frequency signals is restricted from "at least one of said at least two wireless devices" without specifying which one of the "at least one of said at least two wireless devices" from which processing of radio frequency

signals is restricted.  Similar to the "one of the radio-frequency transceivers" term, this ambiguity

could have been cured during prosecution, but now the claim is ambiguous and indefinite.  Further,

claim 1 claims (in the phrase at issue) that communication is improved with "at least one said wireless

device," and it is not clear whether such "said wireless device" means the "at least one of said at least

two wireless devices" from which processing of radio frequency signals is restricted or the other one

of the "two wireless devices."

### 8.    Claim 12 of the '284 Patent

| Term | Nokia/Huawei Proposal | Traxcell proposal |
|---|---|---|
| Claim 12 of the '284 Patent | Indefinite, as directed to both "[a] machine and process for tuning a wireless network," including method steps of using the claimed "machine," e.g., "wherein a user of one of said at least two wireless devices is able to set a no access flag within the memory of said first computer." | Whether claim is indefinite is not properly part of Markman proceeding. |

Once again Traxcell chose not to brief indefiniteness for this term and has waived its

arguments.  *Cinel*, 15 F.3d at 1345; Dkt. 183 at 5. Nonetheless, it is clear that this claim is indefinite

under binding precedent from the Federal Circuit.  The Federal Circuit has instructed that claims must

be directed to ***either*** methods or apparatuses, but not both, as claim 12 is.

In the seminal case on this issue, the Federal Circuit found a claim indefinite because "it [was]

unclear whether infringement of [the] claim [] occurs when one creates a system . . . , or whether

infringement occurs when the user actually uses the input means . . . .  Because [the] claim [] recites

both a system and the method for using that system, it does not apprise a person of ordinary skill in the

art of its scope, and it is invalid under section 112, paragraph 2."  *IPXL Holdings, L.L.C. v.

Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005); *see also Rembrandt Data Technologies, LP*

*v. AOL, LLC*, 98 U.S.P.Q.2d 1393 (Fed. Cir. 2011) (affirming summary judgment of invalidity because apparatus claim improperly included method steps where claim recited "A data transmitting device for transmitting signals corresponding to an incoming stream of bits, comprising: . . . [listing several structural components] and transmitting the trellis encoded frames") (ellipses and omissions in original).

It is rare that a claim is so clearly directed to both a method and apparatus.  Here, the preamble to the claim makes clear that this is so, stating that the claim is directed to both "[a] machine ***and*** process for tuning a wireless network."  Claim 12 proceeds to inseparably describe both apparatus and method steps.  First, the claim describes typical apparatus elements, such as "at least two wireless devices" and "a first computer."  The claim then recites a number of method steps, such as "wireless devices communicating via radio frequency signals" and the "first computer corrects the radio frequency signal of the radio tower."   Claim 12 of the '284 Patent therefore impermissibly mixes method and apparatus claims, and is invalid for indefiniteness.  *See In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1318 (Fed. Cir. 2011).

Dated:  November 13, 2018

Respectfully submitted,

<table>
<tr>
<td>

*/s/ Nathan Hamstra*
David A. Nelson
Nathan Hamstra
Marc Kaplan
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Dr., Suite 2700
Chicago, IL 60606
(312) 705-7400
(312) 705-7401 (Facsimile)
davenelson@quinnemanuel.com
nathanhamstra@quinnemanuel.com
marckaplan@quinnemanuel.com

Michael E. Jones
Texas Bar No. 10929400
mikejones@potterminton.com
E. Glenn Thames, Jr.
Texas Bar No. 00785097
glennthames@potterminton.com
Patrick C. Clutter
Texas Bar No. 24036374
patrickclutter@potterminton.com
POTTER MINTON
A PROFESSIONAL CORPORATION
110 North College Avenue, Suite 500
Tyler, Texas 75702
Tel: 903-597-8311
Fax: 903-531-3937

*Attorneys for Nokia of America Corporation*
*(Successor in Interest to Nokia Solutions and*
*Networks US LLC) and*
*Nokia Solutions and Networks Oy*

</td>
<td>

*/s/ Amy E. LaValle*
Amy E. LaValle – Lead Attorney
Texas Bar No. 24040529
amy.lavalle@wickphillips.com
Nick Nelson
Texas Bar No. 24074804
nick.nelson@wickphillips.com
WICK PHILLIPS GOULD & MARTIN, LLP
3131 McKinney Avenue, Suite 100
Dallas, Texas 75204
Tel:  214-692-6200
Fax: 214-692-6255

Ryan D. Jenlink
Texas Bar No. 24065491
ryan.jenlink@wickphillips.com
WICK PHILLIPS GOULD & MARTIN, LLP
Granite Park Two
5700 Granite Parkway, Suite 330
Plano, Texas
Tel:  214-297-0250
Fax: 214-297-0284

Melissa R. Smith
Texas Bar No. 24001351
melissa@gillamsmithlaw.com
GILLAM & SMITH, LLP
303 South Washington Avenue
Marshall, Texas 75670
Tel:  903-934-8450
Fax: 903-934-9257

*Attorneys for Defendant*
*Huawei Technologies USA, Inc.*

</td>
</tr>
</table>

## **CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service and are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on November 13, 2018.

*/s/ Nathan Hamstra.*
Nathan Hamstra